NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 20-00642 (SRC)** |
| VICTOR ABREU | : | |
| | : | **OPINION & ORDER** |
| | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the omnibus pretrial motion filed by Defendant Victor Abreu ("Defendant") [ECF 37 and ECF 52]. The United States of America (the "Government") has filed its response to the motion. Oral arguments were presented on May 5, 2021 and an evidentiary hearing was held on June 24, 2021. The Court has considered all of the written submissions by the parties, the parties' oral arguments, as well as the evidence presented during the evidentiary hearing and rules on the various motions as follows.

I.    BACKGROUND

Prior to the commencement of this action, the Safe Highway Initiative through Effective Law Enforcement Detection Unit (the "SHIELD Unit") of the Pennsylvania State Police was informed, through its supervisor, Corporal Paul Lindsay, that the Federal Bureau of Investigation (the "FBI") had been conducting a nearby narcotics investigation and that the SHIELD Unit's assistance was requested with this investigation. More specifically, the SHIELD Unit was requested to assist the investigation by performing a traffic stop of Defendant's tractor-trailer, as the FBI believed that Defendant was involved in a narcotics conspiracy and hoped that during

1

the traffic stop, Defendant would consent to a search of the tractor-trailer, which would then

allow law enforcement to confirm or deny certain aspects of the FBI's investigation. Further, to

help the SHIELD Unit perform a traffic stop of Defendant's tractor-trailer, the FBI, pursuant to a

court order by a federal magistrate judge, began tracking Defendant's approximate location

through his cellular phone.

      Once the SHIELD Unit received this information from the FBI, as well as Defendant's

approximate location, two members of the unit, Pennsylvania State Police Trooper Thomas

Fleisher ("Trooper Fleisher") and Pennsylvania State Police Trooper Justin Hope ("Trooper

Hope") were stationed on Interstate 78 on November 17, 2019. At around 5:40 AM during this

patrol of Interstate 78, Trooper Fleisher spotted Defendant's tractor-trailer traveling eastbound.

Trooper Fleisher then followed Defendant for approximately four miles and testified that he

witnessed Defendant cross the right-side fog line[1] on multiple occasions. Further, Trooper

Fleisher also noted in his police report that Defendant had been driving twelve miles below the

posted speed limit. According to Trooper Fleisher's testimony, after observing Defendant violate

state traffic law, he conducted a traffic stop of Defendant's tractor-trailer. Once Defendant was

pulled over, he handed over to Trooper Fleisher his license, registration, insurance card, and the

bill of lading for the shipment in his tractor-trailer. However, Trooper Fleisher was unable to

examine Defendant's electronic logbook, as it had been disabled, according to Defendant, by

accident.

      After telling Defendant that he would only give him a formal warning for crossing over

the fog line, Trooper Fleisher asked Defendant if he was transporting any narcotics in his tractor-

---

[1] The right-side "fog line" is the bright white traffic line between the right-side lane and the right-side shoulder.

trailer. While Defendant claimed that he was not transporting any narcotics, Trooper Fleisher then asked Defendant whether he could search the tractor and trailer to confirm what Defendant had told him. Defendant gave Trooper Fleisher consent to search the tractor, but expressed concern over Trooper Fleisher searching the trailer portion, as that would require him to break the seal on the back of the trailer, which protects the integrity of the load by demonstrating that the load was not tampered with during transport. Trooper Fleisher then told Defendant that he could replace the seal with a state police seal, but Defendant continued to refuse to give consent to search the trailer.

As time went on, Trooper Fleisher attempted to persuade Defendant that, as the owner of the tractor-trailer, he had the ability to consent to the search of the trailer, even though another company had put the load inside, but Defendant still refused to give consent to search the trailer. Nevertheless, Trooper Fleisher continued to tell Defendant multiple times that Defendant had the ability to consent as the owner of the tractor-trailer. Moreover, Trooper Fleisher even told Defendant that "as a state trooper . . . [he] ha[d] the right to open [the trailer] to make sure that that load [was] properly secured." Traffic Stop Tr. at 35. When Defendant still refused to give consent to search the trailer, Trooper Fleisher told him that he was going to have a drug detection canine go around the trailer, and that if the canine alerted to the trailer, then the police would search the trailer without Defendant's consent.

After Defendant continued to refuse to give consent to search the trailer, Trooper Fleisher then put together a consent to search form, written in Spanish at Defendant's request, which indicated that Defendant only consented to the search of the tractor, not the trailer. Soon after, Defendant mentioned that he wished to call his broker to discuss whether the trailer could be

searched. Trooper Fleisher again tried to persuade Defendant that he did not need his broker's permission to consent to a search of the trailer. At that point, Trooper Fleisher also again told Defendant that "as police officers[,] we have the right to open that load and make sure it's secure properly because that's a safety issue." Traffic Stop Tr. at 45. Finally, after being told multiple times that he had the right to consent to the search of the trailer and that the police would replace the cut seal with their own seal, Defendant executed a form consenting to the search of the trailer, with this change being reflected on the consent to search form. Then, before Trooper Fleisher had a chance to search the trailer, he was informed by Pennsylvania State Police Trooper Keith Rudy, the drug detection canine's handler, that the canine had not in fact alerted to the exterior of the trailer.[2] However, this information was not relayed to Defendant at the time and Trooper Fleisher went on to open and search the trailer, which ultimately led to the discovery of narcotics in the trailer.

As a result of the search and its findings, Defendant was arrested and read his Miranda rights. Subsequently, on July 27, 2020, an indictment was filed against Defendant charging him with knowingly and intentionally conspiring with others to distribute and possess with intent to distribute heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A), and 21 U.S.C. § 846.

Then, on March 6, 2021, Defendant filed this omnibus motion, which seeks the following relief: suppression of all evidence seized from his tractor-trailer during the traffic stop; immediate disclosure of Brady and Giglio materials; disclosure of information regarding lost or destroyed evidence; disclosure of Federal Rule of Evidence 404(b) materials; disclosure of

---

[2] The canine had, however, alerted to the presence of narcotics in the driver's compartment of the tractor.

4

Jencks materials; compelled preservation of prosecutorial rough notes, drafts and final reports; disclosure of all scientific and/or expert reports and related materials; disclosure of any alleged coconspirators statements and a pretrial hearing to determine the admissibility of any such statements; disclosure of discovery materials pursuant to Rule 16 of the Federal Rules of Criminal Procedure; and the right to file additional motions as the need arises. The Government, in its opposition papers, has also made its own request that the Court compel Defendant to produce reciprocal discovery. The Court will address each of these requests in turn.

## II.   DISCUSSION

### A.   Defendant's Motion to Suppress All Evidence Seized from his Tractor-Trailer During the Traffic Stop

As Defendant's first and primary request in his omnibus motion, he seeks to suppress all of the evidence seized from his tractor-trailer during the November 2019 traffic stop conducted by Trooper Fleisher. In support of this request, Defendant makes three separate arguments. First, Defendant claims that the traffic stop was unlawful from the start, as Trooper Fleisher lacked reasonable suspicion to support the stop. Second, Defendant asserts that the traffic stop was unlawfully prolonged, particularly due to the use of the drug detection canine. Finally, Defendant asserts that his decision to consent to the search of the tractor-trailer was involuntary, making his consent invalid to support the search.[3]

---

[3] The traffic stop and Defendant's driving for approximately four miles preceding the stop were recorded on a video recorder. Additionally, almost all of the conversation was recorded (except for portions where Trooper Fleisher "administratively" turned off the recording device). An agreed upon transcript of the recording of the stop is part of the record in this case.

1.   <u>Whether Reasonable Suspicion Existed to Support the Traffic Stop</u>

The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." <u>United States v. Robertson</u>, 305 F.3d 164, 167 (3d Cir. 2002) (citing <u>Katz v. United States</u>, 389 U.S. 347, 356-57 (1967)). However, under the well-established exception to the warrant requirement set forth in <u>Terry v. Ohio</u>, 392 U.S. 1, 27 (1968), a brief investigatory stop is considered reasonable and thus, constitutional, when an officer has "reasonable, articulable suspicion that criminal activity is afoot."[4] <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000). Nevertheless, "any evidence obtained pursuant to an investigatory stop . . . that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" <u>United States v. Brown</u>, 448 F.3d 239, 244 (3d Cir. 2006).

Moreover, while a traffic stop is considered a seizure of the vehicle's occupants under the Fourth Amendment, "[b]ecause an ordinary traffic stop is analogous to an investigative detention, it has been historically reviewed under the investigatory detention framework first articulated in <u>Terry v. Ohio</u> . . . ." <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981); <u>United States v. Delfin-Colina</u>, 464 F.3d 393, 396 (3d Cir. 2006). Before determining whether the traffic

---

[4] To be clear, while Pennsylvania state law requires probable cause to conduct a traffic stop in this context, the federal law standard of reasonable suspicion applies here, in determining whether the traffic stop was constitutional under the Fourth Amendment. <u>See</u> <u>Elkins v. United States</u>, 364 U.S. 206, 223-24 (1960) ("In determining whether there has been an unreasonable search and seizure by state officers, . . . the test is one of federal law, neither enlarged by what one state may have countenanced, nor diminished by what another may have colorably suppressed.").

stop in this case was reasonable, it is important to first define the reasonable suspicion standard. While reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[,]" it still means that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Wardlow, 528 U.S. at 123; Cortez, 449 U.S. at 417-18. Additionally, in determining whether reasonable suspicion exists, the Court must consider "the totality of the circumstances—the whole picture." United States v. Sokolow, 490 U.S. 1, 8 (1989).

Furthermore, the reasonable suspicion analysis is entirely objective and does not look to an officer's subjective motive or intent. Whren v. United States, 517 U.S. 806, 813-14 (1996); United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006). As such, even when an officer has another subjective motive for conducting a traffic stop, such as a suspicion that the vehicle contains narcotics, such a traffic stop is still reasonable "when an objective review of the facts shows that [the] officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." Delfin-Colina, 464 F.3d at 398. "In other words, an officer . . . need only produce facts establishing that she reasonably believed that a [traffic law] violation had taken place." Id.

In this case, the Government has presented two arguments in support of its conclusion that Trooper Fleisher had reasonable suspicion to support the traffic stop of Defendant. First, the Government asserts that Trooper Fleisher had reasonable suspicion for the traffic stop because of Defendant's alleged traffic violations. Second, the Government also claimed for the first time in its supplementary brief following the evidentiary hearing that, even putting aside Defendant's

alleged traffic violations, Trooper Fleisher had reasonable suspicion to perform the traffic stop because of his knowledge of Defendant's alleged involvement in transporting narcotics.

> i.   *Whether Trooper Fleisher Had Reasonable Suspicion that Defendant Violated State Traffic Law*

Beginning with the Government's first point, it asserts that Trooper Fleisher had reasonable suspicion that Defendant violated state traffic law—specifically, 75 Pa. C.S. § 3309(1). 75 Pa. C.S. § 3309(1) provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." As such, based on Trooper Fleisher's testimony that he observed Defendant's right-side wheel cross over the fog line, and video footage of Defendant's driving for approximately four miles prior to the stop, the Government claims that Trooper Fleisher put forth facts establishing that he reasonably suspected that Defendant violated this state traffic law.

Before determining whether Trooper Fleisher had reasonable suspicion that Defendant violated state traffic law, the Court reiterates the fact that the reasonable suspicion standard is objective and does not take into account an officer's subjective intent. <u>Whren</u>, 517 U.S. at 813-14. However, while the Court will not consider Trooper Fleisher's subjective motivations when determining whether the objective facts support reasonable suspicion, it nevertheless notes that Trooper Fleisher's subjective desire to aid the FBI with its investigation, as he was tasked to do, puts the entire scenario into context. More specifically, the fact that Trooper Fleisher was directly asked to perform a traffic stop of Defendant by the FBI demonstrates why, in practice, he have been more likely to accidentally act prematurely and stop Defendant without properly

attaining reasonable suspicion first. Indeed, the facts presented by Trooper Fleisher do not persuade the Court that he had reasonable suspicion that Defendant violated § 3309(1).

As demonstrated by the plain language of § 3309(1), perfect compliance is not required. Rather, the statute merely requires that a vehicle be driven "as nearly as practicable" within a single lane and that no movements be made from one's lane until one has determined that the movement can be made "with safety."  75 Pa. C.S. § 3309(1). See also Commonwealth v. Enick, 70 A.3d 843, 847 (Pa. Super. Ct. 2013) (internal citation omitted) ("§ 3309(1) of the Vehicle Code requires motorists to maintain a single lane 'as nearly as practicable.' Thus, the statutory language does not foreclose minor deviations."); Commonwealth v. Feczko, 10 A.3d 1285, 1292 (Pa. Super. Ct. 2010) (considering whether the appellant's "deviations from his lane of travel created a significant safety hazard on the roadway," to determine whether a stop of his car for a violation of § 3309(1) was lawful).[5]

Here, Trooper Fleisher has not demonstrated that he reasonably suspected that Defendant's minor deviations from his lane were done in an unsafe manner. From its review of the video footage, the Court was unable to see Defendant's wheel ever go *over* the fog line. Rather, at best, the Court was only able to see Defendant's wheel *on* the fog line on a couple occasions. Additionally, while Trooper Fleisher testified during the evidentiary hearing that, from his vantage point, he believed Defendant's vehicle went six to twelve inches over the fog line, the video footage does not confirm in any way that Defendant's wheel went more than

---

[5] While these Pennsylvania state cases applied the state probable cause standard to determine whether the stops were lawful, as opposed to the federal reasonable suspicion standard that applies in this case, they are still helpful in that they emphasize the fact that the explicit statutory language of § 3309(1) leaves room for some minor violations of the rule, as long as they do not affect the safety of the roadway.

minimally over the fog line. Further, based on Trooper Fleisher's testimony as to the position of

the recording device, the Court has no reason to believe that Trooper Fleisher's own vantage

point would have been more accurate than the view of the recording device, as presented on the

video footage. Moreover, even assuming *arguendo* that the vehicle did minimally go over the fog

line, the video shows no unsafe driving, the road was virtually free of other vehicle traffic, and

nothing about Defendant's driving was erratic.

In a further effort to demonstrate that Trooper Fleisher reasonably suspected that

Defendant was driving in an unsafe manner, the Government also references the fact that

Defendant had been driving twelve miles below the posted speed limit. While the Government

has conceded that Defendant did not actually violate any traffic laws by driving below the speed

limit,[6] it nevertheless asserts that Defendant's slow speed, combined with the fact that he drifted

onto the fog line, caused his behavior to be "inherently unsafe." Govt.'s Supp. Br at 3. In support

of this point, Trooper Fleisher testified that, because of the time of day (the stop being during the

early morning hours), Defendant's rate of speed, and Defendant's drifting near the fog line, he

"suspected that [Defendant] might be getting tired or sleepy." Evid. Hr'g Tr. at 42. However,

even if Trooper Fleisher did in fact suspect that Defendant might have been tired while driving,

Trooper Fleisher still has not demonstrated that his suspicion that Defendant was a threat to

---

[6] While Trooper Fleisher's police report indicated that Defendant was traveling twelve miles below the posted speed limit, the Government subsequently dropped this point in support of Trooper Fleisher's stop of Defendant, since, as explained during the evidentiary hearing, there is no minimum speed limit in Pennsylvania. Further, while 75 Pa. C.S. § 3364 does discuss requirements regarding minimum speed, it qualifies this regulation by stating that " . . . no person shall drive a motor vehicle at such a slow speed *as to impede the normal and reasonable movement of traffic*." (emphasis added). During the hearing, Trooper Fleisher conceded that Defendant's actions would not qualify as a violation of this statute because there was not a significant amount of traffic on the roadway at that time.

public safety was *reasonable*. Indeed, during the four miles or so that Trooper Fleisher trailed Defendant before pulling him over, Defendant's driving never escalated and remained consistent. Moreover, the weather was clear on that day, there was no debris on the side of the roadway, and other than Defendant and Trooper Fleisher, there was only one other driver present during the time that Trooper Fleisher followed Defendant's vehicle, who was able to safely pass and move onwards. Further, while the Government has pointed out that Trooper Fleisher also testified that, depending on how a load is secured, drifting onto the shoulder could cause a tractor-trailer to overturn, Trooper Fleisher never testified that he actually *suspected* that Defendant's vehicle might overturn, just that it *could* occur in certain situations. For these reasons, while it is possible that Trooper Fleisher subjectively believed that Defendant violated § 3309(1), based on the objective facts presented, he cannot show that his suspicions were reasonable.

While the Government is correct that the Third Circuit explained in <u>Delfin-Colina</u> that, in determining whether reasonable suspicion existed, "an officer need not be factually accurate in her belief that a traffic law had been violated . . . ." 464 F.3d at 398, the Third Circuit qualified this statement by indicating that "a reasonable mistake of fact 'does not violate the Fourth Amendment[,]'" and that while "factual determinations made by government agents need not 'always be correct,' . . . they always have to be 'reasonable.'" <u>Id.</u> (quoting <u>United States v. Chanthasouxat</u>, 342 F.3d 1271, 1276 (11th Cir. 2003) and <u>Illinois v. Rodriquez</u>, 497 U.S. 177, 185 (1990)). Here, even if Trooper Fleisher mistakenly believed that Defendant violated state traffic law, this mistake was not objectively reasonable. A review of the video tape and Trooper Fleisher's own testimony clearly demonstrate that there was no basis for Trooper Fleisher to have a reasonable suspicion that Defendant had violated Pennsylvania traffic law.

11

ii.   *Whether Trooper Fleisher Had Reasonable Suspicion that Defendant*
      *was Transporting Narcotics*

Next, as an alternative argument in support of the lawfulness of the traffic stop, the

Government asserts that Trooper Fleisher had reasonable suspicion to perform the traffic stop

simply based on Defendant's alleged involvement in transporting narcotics. In making this

argument, the Government avers that, prior to his traffic stop of Defendant, Trooper Fleisher was

aware that Defendant was a target of a federal narcotics investigation, that, pursuant to

authorization by a federal court, the FBI was tracking Defendant's location through his cellular

phone, and that the FBI suspected that Defendant was transporting narcotics in his tractor-trailer

from the Southwest United States.

The Government did not make this argument with regard to reasonable suspicion in its

original opposition papers to Defendant's motion to suppress, nor during its oral argument or the

evidentiary hearing. Rather, the Government brought up this point for the first time only in its

supplementary brief after the evidentiary hearing. Moreover, the Court notes that, because the

Government and Defendant were instructed to file their supplementary briefs simultaneously,

Defendant did not have an opportunity to address this new argument by the Government in its

own supplementary brief and was instead given leave by the Court to file an additional response.

Further, in support of its claim, the Government also relies upon a new piece of evidence,

namely the search warrant application package used to track Defendant's cellular phone, which

has been filed under seal. The Government has asserted that the facts known to the FBI, as

detailed in the search warrant application package, as well as the general information regarding

Defendant's involvement in the FBI investigation which was relayed to Trooper Fleisher, were

sufficient to constitute reasonable suspicion to stop Defendant's vehicle.

Due to the Government's delay in filing the search warrant application package ("Exhibit A"), as well as the fact that Defendant has not been given an opportunity to explore the information referenced within Exhibit A, it is highly questionable whether the Court ought to even consider this search warrant application package in deciding this motion to suppress. However, even if the Court were to consider Exhibit A, it would nonetheless conclude that Trooper Fleisher did not have reasonable suspicion to stop Defendant's vehicle on the basis of his alleged involvement with transporting narcotics.

The Government has claimed that, any information that the FBI possessed that indicated that Defendant was involved with the narcotics conspiracy can be imputed to Trooper Fleisher in support of his traffic stop under the collective knowledge doctrine. It is true that "[t]he collective knowledge doctrine allows imputation of one law enforcement officer's knowledge to another officer who actually makes a stop, even if the latter does not possess all relevant facts." United States v. Gonzalez, 630 F. App'x 157, 161 (3d Cir. 2015). "Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" Id. (quoting United States v. Hensley, 469 U.S. 221, 231 (1985)). However, for the collective knowledge doctrine to apply, the officer on the receiving end of the information must be aware that the officer conveying to him the information had sufficient cause (whether it be probable cause or reasonable suspicion, based on the context) to conduct the stop himself.  Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971); Gonzalez, 630 F. App'x at 162.

13

For example, in Gonzalez, one narcotics officer observed certain facts which, combined with his experience and investigative inferences, made it such that he had reasonable suspicion that the individual he observed was involved with illegal drug activity. Id. at 161. Without explaining to his fellow officer what specific facts he observed, he told his fellow officer to stop that individual and gave him a detailed description of him. Id. at 159-160. This second officer then stopped this individual and the Third Circuit concluded that this stop by the second officer was lawful under the collective knowledge doctrine. Id. at 162. In so ruling, the Third Circuit explained that while the second officer testified that he was not explicitly told by the first officer that he had seen the individual engaged in narcotics-related criminal activity, that he was able to infer this because he and the first officer were assigned to patrol for narcotics on that day, and thus that he would only receive this type of request from his colleague if his colleague had first observed the individual participate in criminal activity related to narcotics. Id. at 160 n.3. As such, because the second officer "understood the nature of both the surveillance operation and his role to arrest 'any individuals that [the first officer] observed engaged in narcotics activity[,]'" the Third Circuit held that the first officer's reasonable suspicion could be imputed to the second. Id. at 162. Stated more clearly, the collective knowledge doctrine was applied in Gonzalez because, while the second officer did not know the specific facts in support of the first officer's reasonable suspicion, he was aware that the first officer must have had reasonable suspicion that the individual was involved with illegal narcotics.

This essential requirement under the collective knowledge doctrine—that the officer who actually effectuates the stop must act under the assumption that the original issuing officer had either probable cause or reasonable suspicion (depending on what standard applies in the

context) that the suspect was involved with a specific crime—has been noted by courts in other cases as well. For example, in <u>Whiteley</u>, after an arrest warrant was issued for an individual for his involvement in a robbery, a police officer put out a message on a radio bulletin requesting that officers pick up that individual, with a description of the individual and details of what was stolen. 401 U.S. at 563. Then, another officer, in reliance on the information in the radio bulletin, arrested the individual. <u>Id.</u> In that case, the Court ultimately concluded that the arrest was illegal because the arrest warrant was not actually supported by probable cause. <u>Id.</u> at 565. Nevertheless, the Court made it clear that if the original officer did in fact have probable cause to support the arrest warrant, then the stop would have been lawful, as police officers are "entitled to act on the strength" of another officer's knowledge when they are under the reasonable assumption that the original officer requesting aid had probable cause that the individual was involved in a specific crime. <u>Id.</u> at 568.

Likewise, in <u>United States v. Hensley</u>, after a police officer received information from an informant about the identity of a participant in an armed robbery, the officer issued a wanted flyer to other nearby police departments, which stated that the individual described was wanted for an investigation of an aggravated robbery and asked other departments to pick up and hold the individual if he were located. 469 U.S. 221, 223 (1985). Later, other officers, who were familiar with the wanted flyer, stopped the individual. <u>Id.</u> at 224. There, the Court ultimately concluded that the stop was lawful, as the original officer had reasonable suspicion that the individual was involved with the robbery, thus the other officers were "able to act on the basis of [the] flyer indicating that another department ha[d] a reasonable suspicion of involvement with a crime[,]" that is, the robbery. <u>Id.</u> at 231-32.

Here, on the other hand, even assuming *arguendo* that, based on the information included in Exhibit A, the FBI had reasonable suspicion that Defendant was transporting narcotics on the date in question, the collective knowledge doctrine cannot apply because Trooper Fleisher did not base the traffic stop on the assumption that the FBI had reasonable suspicion that Defendant was transporting narcotics then. Rather, the Government has always asserted, and Trooper Fleisher has consistently testified, that he was asked to stop Defendant simply on the basis on a traffic violation. See Evid. Hr'g Tr. at 22 (emphasis added) ("It was related to [Trooper Fleisher] that [his] assistance was being requested for the purposes of a *traffic stop* relating to [the FBI's] ongoing narcotics investigation."); Evid. Hr'g Tr. at 29 (emphasis added) ("[The FBI] had requested a *traffic stop* on [Defendant's] vehicle . . . [that is, that Trooper Fleisher] conduct[] a *lawful traffic stop* and obtain[] consent to search [the] vehicle to confirm or deny their suspicions . . . that [Defendant] was involved in transporting large amounts of narcotics . . . ."). Trooper Fleisher has never indicated that he stopped Defendant's car because he relied on the FBI's indication that they were investigating Defendant for narcotics trafficking. Instead, he has consistently maintained that his basis for his stop of Defendant's vehicle was his alleged traffic violations. See Evid. Hr'g Tr. at 126 ("Q: And you pulled [Defendant] over for a motor vehicle violation. Correct? A: Correct.").

This type of post-hoc rationalization for his stop of Defendant's vehicle cannot support reasonable suspicion under the collective knowledge doctrine. Trooper Fleisher never claimed that the legal basis for the stop of Defendant's vehicle was grounded on his knowledge that Defendant was suspected of narcotics activity, and the Government cannot attempt to utilize the FBI's own alleged information to justify the stop after the fact. More specifically, the collective

16

knowledge doctrine cannot apply where, unlike in <u>Gonzalez</u> and <u>Hensley</u>, Trooper Fleisher was not aware at the time of the stop that the FBI allegedly had reasonable suspicion that Defendant was transporting narcotics and did not purport to stop the vehicle on that basis.

In short, while Trooper Fleisher has admitted that he was subjectively motivated to conduct the stop of Defendant's vehicle by his desire to explore Defendant's possible involvement with narcotics activity, as has been explained previously, Trooper Fleisher's subjective intent is irrelevant and cannot support reasonable suspicion. Therefore, because Trooper Fleisher cannot demonstrate that he had reasonable suspicion to believe that Defendant had committed a traffic violation, which was the basis for the traffic stop, the traffic stop was unlawful, and thus the evidence seized as a result of the stop must be suppressed.

### 2.   <u>Whether the Traffic Stop was Unlawfully Prolonged</u>

Next, Defendant has also asserted that the traffic stop was unlawful because it was prolonged beyond the time reasonably required to handle the alleged traffic violation, primarily because of the use of the drug detection canine. However, the Court need not examine this issue as it has already determined that the stop was unlawful due to the lack of reasonable suspicion.

### 3.   <u>Whether Defendant's Consent was Given Voluntarily</u>

Defendant's third and final argument in support of his motion to suppress is that, even assuming *arguendo* that the traffic stop itself was lawful, the search of Defendant's trailer was still unconstitutional because the consent given by Defendant was involuntary. While the Court need not consider this issue, as it has already determined that the stop was in fact unlawful, because of the numerous issues concerning the voluntariness of Defendant's consent here, it deems it important to nonetheless discuss the matter of Defendant's consent.

17

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz, 389 U.S. at 357). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Id. However, when "the State attempts to justify a search on the basis of [one's] consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Id. at 248. See also Bumper v. North Carolina, 391 U.S. 543, 548 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.").

In examining an individual's alleged consent, "the question whether a consent to a search was in fact 'voluntary'. . . is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Id. at 229. Moreover, "[c]ertain factors that courts consider in determining whether confessions were voluntary, such as the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged, are relevant to [a court's] examination." United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994) (internal citation omitted). See also United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003) ("[T]he critical factors comprising a totality of the circumstances inquiry [regarding

18

the voluntariness of consent] . . . include[e] the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual."). Yet, "whether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion." Kim, 27 F.3d at 955. As such, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." Schneckloth, 412 U.S. at 228. Nevertheless, "if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then . . . the consent [is] invalid and the search unreasonable." Id. at 233.

Here, Defendant has put forth many facts that, when considered as a whole, indicate that his consent was not given voluntarily. To begin, many aspects of the traffic stop in general served to put Defendant in a vulnerable state. While not necessarily unreasonably prolonged under the law, the stop was on the longer end, lasting over an hour from the beginning of the stop until the search of the trailer was conducted. It was during the early morning hours, making it likely that it was not completely light outside and that not many other drivers were on the road. During this extended stop outside, the weather was also cold, as can be gleaned from the fact that Trooper Fleisher asked Defendant on multiple occasions whether he wanted his jacket or to sit in the patrol car for warmth. While the Court in Schneckloth noted that consent searches are less likely to involve coercion than custodial interrogations "since consent searches will normally occur on a person's own familiar territory," 412 U.S. at 247, here, by the time that Defendant allegedly consented to the search of the trailer, he certainly was not on his own territory, but was

19

on the side of an empty highway during the early morning hours with three police officers with visible guns in their holsters and a drug detection canine. These elements all combined to create a setting that put Defendant in a more vulnerable state, and thus made it more likely that any eventual consent given by Defendant would not be voluntary.

Additionally, while Defendant may not have been in custody when the alleged consent was given, Trooper Fleisher later conceded at the evidentiary hearing that, at no point during the traffic stop was Defendant free to leave. Additionally, in part due to the fact that English is not Defendant's first language, there were many instances in which Defendant and Trooper Fleisher had trouble effectively communicating with and understanding each other. Just like courts consider the age, education and intelligence of the consenting individual to help determine the voluntariness of his consent, here too, Defendant's language difficulties affected his ability to voluntarily consent under the circumstances.

Beyond these aspects of the stop that were likely to make it somewhat coercive, Trooper Fleisher also continued to ask Defendant for consent to search the trailer after Defendant had refused to consent on numerous occasions. Furthermore, when Defendant expressed concern about opening the trailer without his broker's permission or the permission of the owners of the load, Trooper Fleisher attempted to persuade Defendant time and time again that, as the owner of the vehicle, he had the ability to consent to the search of the trailer. While Trooper Fleisher was correct that Defendant could consent and did not mislead Defendant in that regard, that does not take away from the fact that a person in Defendant's vulnerable state would likely feel coerced to consent under the pressure of Trooper Fleisher's nearly constant requests for consent. By repeatedly asking Defendant for consent to search the trailer and stating that Defendant's

20

hesitancy to allow for the search of the trailer appeared suspicious, Trooper Fleisher subtly coerced Defendant to consent to the search of his trailer. Moreover, while Trooper Fleisher was not required to inform Defendant that he was entitled to refuse consent, the fact that Trooper Fleisher never directly told Defendant that he had the right to refuse consent is a factor that the Court may consider.[7] Particularly in this context, where Trooper Fleisher went out of his way multiple times to persuade to Defendant that he *could* consent, the Court finds it somewhat troubling that, on the other hand, Trooper Fleisher never clarified for Defendant that he was not *required* to consent. Additionally, after Defendant refused to give consent to search the trailer multiple times, Trooper Fleisher then warned Defendant that he would have the drug detection canine examine the exterior of the trailer, and that if the canine alerted to the trailer, that it would be searched, despite Defendant's lack of consent. Here too, while Trooper Fleisher was correct that, legally, he would be able to search the trailer without Defendant's consent if the drug detection canine were to alert to the exterior of the trailer, in this context, after Defendant had continuously refused to give consent, relaying this information to Defendant only served to further create a coercive atmosphere.

Furthermore, not only did Trooper Fleisher not explain to Defendant that he was not required to consent, but indeed, on two occasions, Trooper Fleisher even misled Defendant (albeit accidentally) by stating that he had the authority to open Defendant's trailer to determine that his load was safely secured, even without Defendant's consent. See Traffic Stop Tr. at 35 ("I

---

[7] The Court notes that the consent to search form, which was provided to Defendant in Spanish at his request, did state that Defendant had the right to refuse or deny consent. While this does lend some support to the Government's claim that the consent was voluntary, it appears that Trooper Fleisher did not bring Defendant's attention to this part of the form nor did he tell Defendant himself of his right to refuse consent, making it likely that Defendant was not in fact aware of his right to refuse consent.

as a state trooper . . . I have the right to open that truck to make sure that that load is properly

secured."); Traffic Stop Tr. at 45 ("[A]s police officers[,] we have the right to open that load and

make sure it's secure properly because that's a safety issue."). At the evidentiary hearing,

Trooper Fleisher confirmed that only trained inspectors can conduct these types of inspections

and that ordinary police officers can only perform this type of inspection when the weight of the

trailer looks off-balance and therefore like it might cause a safety hazard—and that he did not

have the required training or authorization to conduct this type of inspection. While Trooper

Fleisher testified that he did not intentionally lie to Defendant and simply misspoke, there was

certainly no way for Defendant to know at the time that what Trooper Fleisher had told him was

in fact inaccurate.

These misleading statements by Trooper Fleisher, even if accidental, served to impliedly

coerce Defendant to consent to the search of his trailer. In Bumper, the Supreme Court examined

whether consent to a search could be considered voluntary when it was given after the officer

asserted that he had a warrant for the search. 391 U.S. at 548. There, the Court held that consent

in such a situation is truly involuntary, as "[w]hen a law enforcement officer claims authority to

search a home under a warrant, he announces in effect that the occupant has no right to resist the

search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is

coercion there cannot be consent." Id. at 550.

The Ninth Circuit examined a similar situation in Orhorhaghe v. I.N.S., 38 F.3d 488 (9th

Cir. 1994) and came to the same conclusion. There, four law enforcement agents appeared at the

petitioner's home and one of them had a visible gun holstered on his hip. Id. at 500. However,

the Ninth Circuit there noted that, while those factors also supported its conclusion that the

22

petitioner's consent was coerced, in so ruling it relied more so on the fact that, when the

petitioner asked whether the agents had a warrant as they were about to enter his home, one of

the agents responded that they did not need a warrant to speak with him. Id. While the Court

understood that the agents did not, in fact, need a warrant to *speak* with the petitioner, being that

the petitioner had just asked the agents whether they had a warrant as they were about to enter

his home, the agent's response "clearly and deliberately misled" the petitioner. Id.

> Although [the agent] did not actually say that the agents did not need a warrant to enter
> the apartment, this is precisely the information [the agent] communicated to [the
> petitioner]. He did so in a manner bound to confuse a person who is not well versed in
> our nation's constitutional limitations on government conduct. In context, there is no
> doubt that [the agent's] statement was intended and received as an assertion that the
> agents had the legal power to enter the apartment without a warrant.

Id.

Here too, by telling Defendant on two separate occasions that as a police officer, he had

the authority to open his trailer, Trooper Fleisher clearly misled Defendant. While, unlike in

Orhorhaghe, it may very well be that Trooper Fleisher's statement was accidental and not meant

to deliberately mislead Defendant, it still had that result. Further, the agent in in Orhorhaghe did

not even actually say that he had the authority to enter the petitioner's home. Here, even if he

was simply mistaken, Trooper Fleisher directly misled Defendant by telling him that he could

open his trailer without his consent.

Nevertheless, the Government has asserted that, since Trooper Fleisher only informed

Defendant that he had the authority to *inspect* the trailer to ensure that the load was secure, not

*search* the trailer, that Trooper Fleisher's misstatement is not relevant to determining whether

Defendant's decision to consent was voluntary. More specifically, the Government claims that

"[w]hile the terms may seem interchangeable, there is a distinction between searching a load and

inspecting a load, in that an inspection is less intrusive than a full search . . . [and that] [t]hese terms of art are familiar to truckers, including the Defendant, who was familiar with the different levels of inspections." Govt.'s Supp. Br. at 5 n.8 (internal citations omitted). However, this attempted distinction between an "inspection" and a "search" is unpersuasive. First of all, Trooper Fleisher never said that he specifically had the right to "inspect" the trailer, rather just that he had the right to *open* the trailer to make sure that the load was properly secured. Second of all, and more importantly, even if it was implied that Trooper Fleisher's stated authority to open the trailer was for inspection purposes, an ordinary citizen, even one who drives a tractor-trailer for a living, and especially a citizen whose first language is not English, such as Defendant, would not understand the nuanced distinction between an inspection and a search. Whatever the label, both would have the same result of opening the trailer and exposing its contents.

Additionally, the Government has also claimed that Trooper Fleisher's misstatements were not what actually caused Defendant to ultimately consent to the search. Rather, the recording of the stop indicates that, chronologically speaking, Defendant consented to the search of the trailer directly after Trooper Fleisher again explained that he would replace the broken seal on the trailer. However, this argument too is unpersuasive. As the Court explained in Schneckloth, the voluntariness of a consent to search must be determined by the totality of the circumstances. Thus, even though it took Defendant some time to execute the consent to search form after Trooper Fleisher twice told him that he could open the trailer without his consent, these misstatements by Trooper Fleisher, coupled with Defendant's continued refusal to consent to the search of the trailer, the length of the stop, the use of a drug detection canine, and Trooper

24

Fleisher's continued questioning of Defendant about the presence of narcotics, all in their totality tended to create a coercive atmosphere. In light of all these factors, the Court must conclude that the Government has failed to meet its burden of establishing that consent to search was voluntarily given.

Finally, the Government has also claimed that, even if the search of the trailer cannot be supported by Defendant's consent, that the search was valid under the automobile exception because, by the time the search was conducted, Trooper Fleisher had probable cause based upon Defendant's prior conduct and the FBI's collective knowledge. Initially, the Court notes that Trooper Fleisher testified that he did not believe that he had probable cause to search the trailer and did not justify his entry on that basis. See Evid. Hr'g Tr. at 157. ("Q: But you had to get the consent [to search the trailer] because you didn't have the authority [to inspect the trailer] and you didn't have probable cause. Correct?" A: Correct."). Thus, again, the Government has attempted to utilize a post-hoc rationalization for a search which Trooper Fleisher based upon Defendant's supposed consent. Moreover, the Court finds it unlikely that Trooper Fleisher had probable cause even using the collective knowledge doctrine at the time he searched the trailer. However, the Court need not reach this issue raised by the Government, as it has already concluded that the initial traffic stop was unlawful for lacking reasonable suspicion, making any subsequent search of the Defendant's vehicle inadmissible as fruit of the poisonous tree. Therefore, for the foregoing reasons, Defendant's motion to suppress is granted.

### B. Defendant's Request for Disclosure of <u>Brady</u> and <u>Giglio</u> Materials

Next, in addition to his motion to suppress, Defendant also seeks disclosure of materials and evidence as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government has

recognized its obligation under <u>Brady</u> to disclose exculpatory evidence in its possession in a prompt and timely manner, that is, in sufficient time for its use at trial. The Government further indicates that it has thus far complied with this obligation and adds that, going forward, the Government will continue to promptly supply Defendant with the required exculpatory material should any come into its possession. The Court considers this response by the Government as adequately addressing Defendant's request for <u>Brady</u> disclosures.

Moreover, Defendant also requests immediate disclosure of materials and evidence required under <u>Giglio v. United States</u>, 405 U.S. 150 (1972). The Government has correctly stated that, while it must comply with its obligations under <u>Giglio</u>, it need not do so immediately. However, while the Government claims that the Court will be able to conduct the trial efficiently if the Government discloses all <u>Giglio</u> materials at least three days prior to the testimony of each witness, the Court finds this time-frame to be inadequate and that it will cause unnecessary delay. Instead, the Court orders that the Government must disclose all <u>Giglio</u> materials at least ten days prior to the testimony of each witness.

**C.  Defendant's Request for Disclosure of Information as to Lost or Destroyed Evidence**

Defendant has also requested that the Government disclose any information that it may have about any evidence that has been lost destroyed. More specifically, while Defendant states that he is not aware of any such evidence at this time, he asks that the Government ensure that no evidence has been lost or destroyed, and further reserves the right to move to dismiss the indictment should information about any lost or destroyed evidence emerge. The Court grants this request by Defendant and requires that the Government disclose to Defendant if it

determines that any evidence has been lost or destroyed, and that if that is the case, Defendant has the right to move to dismiss the indictment.

### D. Defendant's Request for Disclosure of 404(b) Evidence

Defendant also seeks disclosure of Rule 404(b) evidence. While Defendant states that it is currently unknown whether the Government will seek to introduce evidence of other crimes or bad acts in its case-in-chief pursuant to Federal Rule of Evidence 404(b), he claims that the Government must provide notice if they plan to utilize Rule 404(b) evidence. In response, the Government has stated that it is aware of its obligation under Rule 404(b) to provide "reasonable notice" of Rule 404(b) evidence that it intends to offer at trial and that courts in this district have upheld ten-day advance notice of such evidence as reasonable. Thus, the Court orders that the Government must disclose any Rule 404(b) evidence at least ten days before trial.

### E. Defendant's Request for Disclosure of Jencks Materials

Pursuant to the Jencks Act, Defendant seeks prior statements and reports by Government witnesses, as well any notes by the witnesses, and further asks that the Government produce such Jencks Act materials prior to trial. Under the Jencks Act, the Government is not obligated to provide a witness's prior statements until the completion of the witness's direct examination. 18 U.S.C. § 3500. However, in order to avoid trial interruptions, the Government has stated that it will voluntarily produce Jencks materials at least three days prior to the testimony of each Government witness. The Court considers this response by the Government as adequately addressing Defendant's request for Jencks materials.

In its response to Defendant's request for early disclosure of Jencks materials, the Government has requested that Defendant reciprocate by providing Jencks-like material at least

three days in advance of the testimony of any defense witnesses. Being that there is no obligation for defendants to provide prior statements of their witnesses before a witness's testimony, this request by the Government is denied.

### F. Defendant's Request for Compelled Preservation of Prosecutorial Rough Notes, Drafts, and Final Reports

Defendant has also requested that the Government be ordered to preserve any rough notes, interview notes, draft reports, and final reports prepared by agents in connection with the investigation that led to Defendant's arrest. The Government has indicated that the federal agents and prosecutors are aware of and intend to comply with their obligations to preserve their interview notes and handwritten drafts of reports. The Court considers this response by the Government as adequately addressing Defendant's request for compelled preservation of these documents.

### G. Defendant's Request for Disclosure of Scientific and/or Expert Reports and Related Materials

Defendant also seeks disclosure by the Government of all scientific and expert reports, written summaries of proposed reports, and interview material. Defendant has asserted that no expert reports have thus far been provided to Defendant by the Government and that the opinions and qualifications of all Government experts should be provided to Defendant immediately. In response, the Government has stated that it previously informed Defendant of its intent to call expert witnesses and that multiple scientific reports as to the testing of controlled substances have already been disclosed to Defendant. Further, the Government stated that it will supplement its disclosures as it receives additional information from its witnesses, and thus that Defendant's request should be denied as moot. The Court finds the Government's response to Defendant's

28

request for disclosure of scientific and expert reports and materials to be inadequate. While immediate disclosure is not necessary, the Court orders that the Government must disclose these materials to Defendant within sixty days of the date of entry of this Opinion and Order.

### H. Defendant's Request for Disclosure of Alleged Coconspirator Statements and for a Pretrial Hearing to Determine the Admissibility of any Such Statements

Defendant has also requested that the Government disclose all alleged coconspirators statements immediately that it plans to admit under Federal Rule of Evidence 801(d)(2)(E) and that a pretrial hearing be held to determine the admissibility of any such statements. As the Government has explained, the Third Circuit does not require district courts to hold a pretrial hearing to determine the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). Rather, it has held that coconspirator statements may be introduced at trial "without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the government make such a showing by the close of its case." United States v. Ammar, 714 F.2d 238, 246 (3d Cir. 1983). To otherwise hold a pretrial hearing regarding the admissibility of these types of statements would ultimately result in an unnecessarily complex and time-consuming mini-trial. As such, the Court denies Defendant's request for disclosure of any alleged coconspirator statements and a pretrial hearing regarding their admissibility. Instead, in order to have any alleged coconspirator statements considered, the Government will be required at trial to make a showing of admissibility under Federal Rule of Evidence 801(d)(2)(E).

### I. Defendant's Request for Rule 16 Disclosures

Defendant also seeks an order requiring the Government to comply with its discovery obligations under Rule 16 of the Federal Rules of Criminal Procedure. The Government has

indicated that it has thus far complied with its discovery obligations obligation and adds that, going forward, the Government will continue to do so. The Court considers this response by the Government as adequately addressing Defendant's request for Rule 16 disclosures.

### J.  Defendant's Request for the Right to File Additional Motions

Defendant has requested the right to make any additional motions at a later date. The Government does not oppose this request; however, it claims that any additional motions brought by Defendant should be limited to issues raised by future Government disclosures. The Court agrees with the Government's assertion and orders that Defendant's right to file additional motions is limited to issues raised by any future disclosures by the Government.

### K.  The Government's Request for Reciprocal Discovery by Defendant

Finally, the Government, in its opposition papers, has made its own request—that the Court enter an order compelling the production of all discoverable information by Defendant. This request is granted and Defendant is ordered to disclose all of its discoverable information to the Government within sixty days of the date of entry of this Opinion and Order.

### III.  ORDER

For the foregoing reasons, it is **SO ORDERED** that Defendant's omnibus pretrial motion [ECF 37 and ECF 52] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the Government's request for reciprocal discovery by Defendant is **GRANTED**, and thus that Defendant is **ORDERED** to disclose all of its discoverable information to the Government within sixty days of the date of entry of this Opinion and Order; and it is further

30

**ORDERED**, therefore, that Defendant's omnibus pretrial motion [ECF 37 and ECF 52]

is **TERMINATED**.

_____s/ Stanley R. Chesler_____
STANLEY R. CHESLER
United States District Judge

Dated: August 12, 2021

31